The Honorable Kymberly K. Evanson

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AHP CAPITAL MANAGEMENT LLC, an Ohio
limited liability company, as Administrator of
American Homeowner Preservation Trust Series
2015A+ and American Homeowner Preservation
Trust Series AHP Servicing,

                            Plaintiff,

        v.

OAK HARBOR CAPITAL, LLC, a Delaware
limited liability company; LAND HOME
FINANCIAL SERVICES, INC., a California
Corporation; ATLANTICA, LLC, a Delaware
limited liability company; MAGERICK, LLC, a
Delaware limited liability company; WILLIAM
WEINSTEIN, an individual; WWR
MANAGEMENT, LLC, a Delaware limited
liability company; WESTERN ALLIANCE
BANK, an Arizona Corporation; BANNER
BANK, a Washington Bank Corporation;
BRADLEY WAITE, an individual; and DOES
1-50, inclusive,

                            Defendants.

NO. 2:25-cv-00007-KKE

CERTAIN DEFENDANTS'[1] MOTION TO
DISMISS THE RICO AND CERTAIN
OTHER CLAIMS

NOTE ON MOTION CALENDAR:
APRIL 11, 2025

---

[1] This motion is filed on behalf of all remaining defendants other than Western Alliance Bank.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE)

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ............................................................................................... 2

    A.    The MLSA Transferred Ownership of the Loans. ........................................ 2

    B.    The So-Called "Bank Fraud Scheme" ............................................... 5

    C.    The So-Called Insurance Fraud Scheme.............................................. 6

III.  ARGUMENT .................................................................................................... 8

    A.    Legal Standard. ................................................................................. 8

    B.    The Complaint Does Not Adequately Plead a "Pattern" of Racketeering
        Activity. ............................................................................................. 8

    C.    The Complaint Fails to Plausibly Allege Predicate Acts Constituting
        Racketeering Activity. ...................................................................... 14

    D.    The RICO Claims Against Land Home Should Be Dismissed For the
        Additional Reason That the Complaint Fails to Plead It Did Anything
        Other Than Service MLSA Loans. ................................................... 15

    E.    The Breach of Fiduciary Duty and Negligence Claims Against Land Home
        Should Be Dismissed Because Land Home Did Not Owe AHP Any Duty. ..... 17

    F.    The California Statutory "Theft" Count Fails to State a Claim. ..................... 18

    G.    The California Business and Professional Code § 17200 Claim Fails to
        State a Claim. .................................................................................... 19

    H.    The RESPA Counts Fail to State a Claim.......................................... 20

    I.    The "Money Had and Received" Count Against WWR Fails to
        State a Claim. .................................................................................... 22

IV.   CONCLUSION................................................................................................ 22

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - i

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

## I.    INTRODUCTION

A central premise of the RICO claims is plaintiff's claim that the AHP Trusts[2] "own" the mortgage loans at issue and that certain defendants "stole" them.  That premise is conclusively refuted by the governing contract, the MLSA.[3]  Under the MLSA, the AHP Trusts sold and transferred their interest in the loans.  If, and only if, the buyer, Cymbidium Restoration Trust ("Cymbidium"), received all amounts owed under the MLSA, were any then-remaining loans to be conveyed back to the AHP Trusts.  The parties now have a dispute about whether all amounts owed were paid.  That contract performance dispute does not alter the MLSA provisions that the AHP Trusts sold and transferred the loans to Cymbidium.  The express provisions in the MLSA render any claim by AHP that the loans were "stolen" implausible— and nothing in the mantra-like repetition of that term in the over 120-page Complaint changes that.  Put simply, because AHP does not own the loans, the loans cannot plausibly have been "stolen" from it.  The claimed RICO predicate act of having "stolen" the loans collapses when gauged against the express terms of the MLSA.

The other RICO predicate acts that are alleged fare no better.  The Complaint does not plead facts that plausibly show charges were imposed for "non-existent" insurance.  In fact, those allegations in the Complaint rely on documents that show there was casualty and property damage claim coverage.

Another fundamental defect regarding the RICO claims is the failure (and inability to) allege a "pattern" of racketeering activity.  This is a commercial dispute grounded in the MLSA.  Stripped of the implausible allegations, the claim is essentially a single alleged fraud perpetrated against a single alleged victim, AHP.  There either are no other alleged "victims" or they are ancillary and tangential to the singular fraudulent scheme alleged.  As such, they are not

---

[2] Plaintiff is referred to herein as the "AHP Trusts" or "AHP."
[3] The "MLSA" refers to both (i) the Mortgage Loan Sale Agreement With Repurchase Obligation, and (ii) its First Amendment.

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

"victims" for purposes of establishing a "pattern" as contemplated under longstanding Ninth Circuit RICO law.

Regarding defendant Land Home Financial Services, Inc. ("Land Home"), it is a mortgage servicer. The Complaint alleges nothing more than that Land Home serviced supposedly "stolen" loans for other defendants. Providing routine commercial services such as loan servicing falls far short of what is required for potential RICO liability.

Also regarding Land Home, no legal basis exists for it owing AHP a duty of care or a fiduciary duty. The negligence and fiduciary duty claims against Land Home should be dismissed.

Lastly, the statutory claims under the Real Estate Settlement Procedures Act and the California Penal Code and the California Business and Professional Code also should be dismissed.

## II.    BACKGROUND

### A.    The MLSA Transferred Ownership of the Loans.

Cymbidium paid the AHP Trusts over $24 million under the MLSA.[4] The MLSA clearly provides that the loans were (i) sold by AHP to Cymbidium, and (ii) that AHP has no right to any remaining loans (or their proceeds) unless and until Cymbidium has received all amounts owed under the MLSA. Initially, the Mortgage Sale Agreement had two groups of loans: Category A and Category B loans.[5] The Category B loans were a $19.75 million pool of loans that were to be sold through Mission Capital, and if not sold, AHP was obligated to repurchase them a few months later.[6] Under the First Amendment, AHP's repurchase obligation was eliminated, and the Category B loans were to be sold with all proceeds going to

---

[4] Redacted copies of the initial Mortgage Loan Sale Agreement With Repurchase Obligation ("Mortgage Sale Agreement") and the First Amendment are Exhibits 1 and 2 to the Declaration of Bradley S. Keller in Support of Certain Defendants' Motion to Dismiss ("Keller Decl.").
[5] Keller Decl. Ex. 1 (Mortgage Sale Agreement) at 3 (definition of Mortgage Loan Schedule).
[6] Id. at §§ 2 and 4.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 2

Cymbidium until it received the $19.75 million, plus an agreed rate of return, and all of its financing and certain other costs.[7]

The Complaint alleges that the MLSA did not transfer actual ownership of the Category B loans but only "certain rights."  Compl. ¶ 54.  But what the MLSA actually provides is:

- The first "whereas" clause recites the AHP Trusts' desire to <u>sell</u> the loans and Cymbidium's desire to <u>purchase</u> them.

- Section 2 provides that the AHP Trusts agree to <u>sell</u> and Cymbidium agrees to <u>purchase</u> the loans, and that the Trusts sell, transfer, assign, and convey the loans, including any right, title or interest the AHP Trusts have in them.

- Section 2 also provides that the purchaser is entitled to receive any payments or other loan recoveries.

- Section 7.01 provides that the mortgage servicer's computer system is to clearly reflect that the loans have been sold, and after a transition period, the Loan Mortgage Files are to be delivered to the successor servicer.

- Section 7.02 provides that the AHP Trusts release any interest in the Mortgage Files.

- Section 8.01(vii) provides that AHP represents and warrants that the transfer and assignment of the loans "shall vest in the Purchaser all rights as owner of such Mortgage Loans free and clear of any and all claims, charges, defenses, offsets and encumbrances of any kind or nature whatsoever, including but not limited to, those of the Seller."

- And in Section 15, the parties reiterated their intent that this was a <u>sale</u> of the Loans.

Only if Cymbidium received all amounts owed under the MLSA were any then-remaining loans to be conveyed back to AHP.  This is spelled out in the First Amendment,

---

[7] Keller Decl. Ex. 2 (First Amendment) at ¶¶ 1, 3-5.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

which provides for Cymbidium to first recover from the loans its costs, certain fees, the $19.75 million purchase payment, and the funds borrowed from Western Alliance Bank ("Western Alliance") to purchase the loans.  If there were any remaining Category B loans then, AHP had a contractual right to receive them back.[8]

There was no mystery that a Cymbidium affiliate had borrowed from Western Alliance most of the $25 million that AHP was paid for the loans.  The "waterfall" provision in the First Amendment specifically required that the Western Alliance borrowing had to be repaid with MLSA loan proceeds before any remaining loans were to be conveyed back to AHP.[9]  And AHP agreed, in the First Amendment, that sales of loans to others needed to be done so that Cymbidium and its affiliate's obligations to Western Alliance were met.[10]  There is nothing in the MLSA that restricted the purchaser's right and ability to transfer the loans to others or to pledge the loans as collateral to Western Alliance or anyone else.

Nor was there any secret or non-disclosure that the Cymbidium affiliate was defendant Magerick LLC ("Magerick").  Prior to closing, the AHP Trusts were told in writing that Cymbidium was purchasing the loans "for the benefit of Magerick LLC" and the transaction was even referred to as the "AHP-Magerick transaction."[11]

These MLSA provisions expose one of the fatal flaws in the RICO and other claims which depend on AHP's contention that the loans were "stolen" or that they could not be pledged to Western Alliance.  First, under the MLSA, ownership of the loans was conveyed by AHP to Cymbidium.  The Trusts not only contractually relinquished any right, title or interest in

---

[8] Keller Decl. Ex. 2 (First Amendment) ¶ 5 ("Thus, upon payment in full of these amounts, the remaining Mortgage Loans and other assets including excess cash are to be assigned and transferred back to the Seller.").
[9] *Id.* ¶ 5.
[10] *Id.* ¶ 6 ("The Seller acknowledges that Purchaser has to meet its and its affiliates' obligations to Western Alliance Bank, one of the primary funding sources for the transactions contemplated under the Agreement.").
[11] *Id.* Ex. 3 (9/21/2022 email Weinstein to Newbery); *see also Id.* Ex. 4 (10/6/2022 email Weinstein to Newbery) referring to the MLSA transaction as the "AHP-Magerick transaction." Both of these emails are specifically referenced and quoted in ¶ 75 of the Complaint.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 4

them, they represented and warranted that AHP had no claim to the loans. And the MLSA does not restrict in any way the purchaser's right to further transfer or pledge or encumber the loans. Cymbidium or Magerick therefore had the right to transfer the loans to others, or to pledge them to get the financing used to fund the $25 million paid to AHP. Second, AHP has no right under the First Amendment to receive back any of the loans unless prior proceeds from them were sufficient to pay off the Western Alliance loan and other amounts owed. AHP's (disputed) contention that it paid the amounts owed under the MLSA gives it, at most, a claimed contractual right to have the remaining loans transferred to it. But claiming a contractual right does not give AHP ownership of the loans. Under the MLSA, ownership of the loans was transferred to Cymbidium, and that is where it remains.

**B.      The So-Called "Bank Fraud Scheme."**

The Complaint alleges that Magerick and William Weinstein (and others) fraudulently represented to Western Alliance that Magerick owned and could pledge the loans as collateral for the Western Alliance purchase financing. (Compl. ¶¶ 155-162 and 193-228). But the implausibility of that fraud claim is apparent from other allegations in the Complaint, including:

- That Cymbidium purchased the loans "for the benefit of Magerick LLC." (Compl. ¶ 75).
- The Secured Participation Agreement in which Cymbidium transferred to Magerick 100 percent of its beneficial and economic rights in the MLSA loans (Compl. ¶¶ 232-35).

The Complaint never explains (nor can it) why a lender would be defrauded by Magerick pledging the MLSA loans when Magerick had 100 percent of Cymbidium's beneficial and economic rights regarding the loans. The Complaint does claim the Magerick Participation Agreement was not signed by Cymbidium until July 2023. (Compl. ¶ 233). But so what. Even if true, the Participation Agreement was entered into "as of October 7, 2022," which is the

effective date of the MLSA and when Cymbidium purchased the loans "for the benefit of Magerick."[12]

The Complaint's allegation that AHP was somehow harmed by Magerick pledging the MLSA loans also is implausible. That pledge is what enabled the credit facility that provided the $20 million AHP was paid for the Category B loans. Put simply, AHP was the financial beneficiary of the pledging of the loans by Magerick—to the tune of $20 million. The allegation that the prior pledging of the loans now prevents AHP from getting any loans back unencumbered also is not plausible. The "waterfall" in the First Amendment requires that the Western Alliance borrowing be repaid before any remaining loans are to be conveyed back to AHP. With repayment of the Western Alliance borrowing, any encumbrance from any prior pledge goes away.

## C.    The So-Called Insurance Fraud Scheme.

The Complaint alleges that AHP and borrower/homeowners were fraudulently billed for allegedly "non-existent" insurance (Compl. ¶ 397-99). But here, again, other allegations in the Complaint—and documents specifically referenced in the Complaint—show the implausibility of that allegation. The other allegations show that (i) claims over $150,000 were covered by a Lloyd's of London policy, and (ii) a dedicated self-administered sinking fund existed to pay covered claims of less than $150,000.

First, the Complaint acknowledges a policy was, in fact, procured from Lloyd's that covered homes worth more than $150,000 for losses that exceeded $150,000 (Compl.¶ 362), and that a third of the mortgaged properties exceeded the $150,000 value threshold (Compl. ¶ 368).

Second, the Complaint alleges that the procedures and coverage for claims within the $150,000 Lloyd's deductible are set forth in (i) a February 16, 2022, "Notification and

---

[12] Keller Decl. Ex. 5 (Cymbidium-Magerick Secured Participation Agreement) at ¶ 1. The Participation Agreement is specifically referenced in ¶¶ 232-35 of the Complaint.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Acknowledgement" (Compl. ¶ 364(c)), and (ii) a September 9, 2022 Standard Operating Procedure (Compl. ¶ 364(d)). Those documents show that valid claims under $150,000 were paid out of a dedicated, self-administered sinking fund; that a borrower's claim (as opposed to an Oak Harbor claim) would be administered by a third-party, Sedgwick Claims Management Services and paid out of the fund; and that the fund would be used only "to pay insurance claims and nothing else."[13]

The evidence will show that millions of dollars of insurance claims have been paid from the sinking fund under these procedures. But for purposes of this motion, the issue is does the Complaint allege sufficient facts that make it plausible that there was no coverage for any mortgaged properties—and that AHP and borrower's were being charged for "non-existent" coverage. The entire factual basis for AHP's claim that coverage was "non-existent" is that, for a single property, AHP initially did not get a response to several email inquiries it made to Land Home that began in mid-December 2023 (Compl. ¶¶ 386-92). According to the Complaint, Land Home, which was servicing that loan on behalf of Oak Harbor (not AHP), responded in March 2024 by telling AHP that the property it was inquiring about concerned an Oak Harbor account loan, not an AHP loan, and that AHP should contact Oak Harbor with any questions (Compl. ¶ 394).[14] The Complaint does not allege that AHP then did what Land Home suggested: ask Oak Harbor.

The plausible inference from the facts alleged is that AHP had a question about whether coverage existed for a fire that had occurred at one property; AHP was told by Land Home to ask Oak Harbor; and AHP did not do so. Those facts do not plausibly support the contention that there was no coverage for that one property, let alone hundreds of other properties.

---

[13] Keller Decl. Ex. 6 (2/16/2022 Notification and Acknowledgment) and Ex. 7 (9/2/2022 Standard Op. Proc.). Both exhibits are specifically referenced in Complaint ¶ 364 (c) and (d).
[14] Given that litigation already was pending between AHP and Cymbidium regarding ownership of the MLSA loans, Land Home's response that AHP should contact Oak Harbor is neither surprising nor suspicious.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

## III.    ARGUMENT

2

### A.    Legal Standard.

3    This is a Rule 12(b)(b) motion.  To survive, the complaint must allege enough facts to

4    state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78

5    (2009).  The pleading obligation "requires more than labels and conclusions, and a formulaic

6    recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550

7    U.S. 544, 570 (2007).  "[C]onclusory allegations of law and unwarranted inferences are

8    insufficient to defeat a motion to dismiss for failure to state a claim."  *Epstein v. Washington*

9    *Energy Co.*, 83 F.3d 1136, 1150 (9th Cir. 1996).

10    Documents referenced in the complaint or that form the basis for the claims pled are

11    considered as being part of the complaint under the incorporation by reference doctrine.  *Khoja*

12    *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *United States v. Ritchie*, 342

13    F.3d 903, 908 (9th Cir. 2003).

14    The MLSA is referenced throughout the Complaint, and because of that, its terms are

15    considered to be part of the Complaint.  The few other documents discussed in the above

16    background also are specifically referenced—and in most cases quoted—in the Complaint.

17    They also can be considered in determining the plausibility of AHP's allegations.

18

### B.    The Complaint Does Not Adequately Plead a "Pattern" of Racketeering Activity.

19    Congress enacted the RICO statute to "eliminat[e] the infiltration of organized crime and

20    racketeering into legitimate organizations operating in interstate commerce."  S. Rep. No. 617,

21    91st Cong., 1st Sess. 76 (1969).  This contract-centric commercial dispute in which AHP claims

22    it was defrauded is not what the RICO statute is designed to address.

23    AHP asserts claims under Sections 1962 (a)-(d) of the RICO statute (Counts 4-9).  All of

24    those sections require pleading a "pattern of racketeering activity."  A "pattern" of alleged

25    racketeering activity must be related <u>and</u> continuous.  *H.J. Inc. v. Nw Bell Tel. Co.*, 492 U.S.

26    229, 243 (1989).  To adequately allege continuity, a plaintiff must allege either "a closed period

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

of repeated conduct" that persisted over a "substantial period of time" ("closed-ended

continuity") or "past conduct that by its nature projects into the future with a threat of

repetition" ("open-ended continuity").  *Id.* at 241-42.  While the Complaint is not clear

regarding which type of continuity is sought to be alleged, AHP apparently is trying to allege

closed-ended continuity.  However, as shown below, it failed to adequately do so.

> Under longstanding Ninth Circuit precedent, RICO's continuity requirement is not
satisfied where a plaintiff merely alleges "a single fraud perpetrated on a single victim."  *United
Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.*, 837 F.2d 356, 360 (9th Cir. 1988).
Indeed, the Ninth Circuit "has found insufficient continuity in every case but two in which there
was only a single victim."  David B. Smith & Terrance G. Reed, Civil RICO ¶ 4.04 (Matthew
Bender 2023).  The first, *Sun Sav. & Loan Ass'n v. Dierdorff*, is an open-ended continuity case,
unlike this case.  The second single-victim case, *Republic of the Philippines v. Marcos*, is a *sui
generis* political case in which the "single victim" was the Republic of the Philippines, not an
individual or a company, and the racketeering activity was carried out on a scale far more
immense than is alleged in this case.  862 F.2d 1355, 1358 (9th Cir. 1988) (en banc).

> The Complaint does try to plead other allegedly defrauded "victims" besides AHP, but it
does not adequately do so.  Its contention that Western Alliance or any other lender was a
"victim" hinges on its claim that the MLSA loans could not be transferred to or pledged by
Magerick.  That is not a plausible claim in the face of the MLSA.  The MLSA transferred
ownership of the loans to Cymbidium, and it did not impose any restriction on Cymbidium's
ability to subsequently transfer the loans or on Magerick's ability to pledge them.[15]
*Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 881 P.2d 986, 994
(1994) ("Contracts are assignable unless such assignment is expressly prohibited by statute,
contract, or is in contravention of public policy.").

---

[15] What the First Amendment did do is obligate Cymbidium to "exercise best efforts in good
faith to maximize the recovery" consistent with Magerick's need to meet its "obligations to
Western Alliance Bank."  Keller Decl. Ex. 2 (First Amendment) ¶ 6.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 9

Nor does the Complaint allege that Western Alliance or any other supposed bank "victim" sustained any loss. Nor could it. The Western Alliance loan is a performing loan.

The Complaint's effort to allege "borrower victims" supposedly paying for "non-existent" insurance fares no better. As previously shown, the actual facts pled in the Complaint do not plausibly support the conclusion that anyone—either AHP or borrowers—were charged for "non-existent" property damage and casualty coverage.

When the implausible contentions regarding other alleged "victims" are removed, what the Complaint alleges is a single allegedly fraudulent scheme to hijack or "steal" the MLSA loans perpetrated on a single alleged victim: AHP. That is not a "pattern" under RICO. *United Energy Owners Comm., Inc.*, 837 F.2d 356, *supra* at 360.

It should also be noted that alleged victims or frauds that are "ancillary" or "tangential" to a singular alleged scheme also are insufficient and do not meet the continuity element of the "pattern" RICO requirement. The Complaint fails to show how any other purported "victims" suffered anything close to a cognizable injury under RICO. The crux of AHP's RICO claims are premised on a single transaction (the MLSA transaction), a single alleged objective (to defraud AHP), a single scheme (to allegedly steal the loans), a single claimed target (AHP), and a single alleged injury (AHP's loss of any remaining MLSA loans).

Courts in this circuit have refused to find multiple victims of an alleged RICO scheme where the harm suffered is "indirect and speculative" or where there is "no legally cognizable injury." *Turner v. Cook*, No. C01-3884 CW, 2002 WL 34420751, at *7 (N.D. Cal. Aug. 28, 2002).

Indeed, a person or entity who is simply the counterparty to transactions that were later the subject of improper accounting or are otherwise relevant but tangential to the alleged scheme is not a victim for purposes of RICO. "To hold otherwise would expand RICO to include any scheme that has an indirect effect on a third party." *Straightshot Commc'ns Inc. v. Telekenex, Inc.*, No. C10-268Z, 2010 WL 11488936, at *6 (W.D. Wash. Nov. 15, 2010)

BYRNES • KELLER • CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    (holding defendant's refusal to provide service to plaintiff's customers did not establish those

2    customers as victims of the scheme "because there is nothing inherently fraudulent about

3    [defendant's] decision to discontinue service to those customers").  "Virtually every imaginable

4    scheme has some effect on parties that are not the intended object of the scheme, and to hold

5    that an indirect effect satisfies RICO's continuity requirement would unreasonably expand the

6    scope of the RICO statute."  *Id.*; *see also D&T Partners, L.L.C. v. Baymark Partners Mgmt.,*

7    *L.L.C.*, 98 F.4th 198, 207 (5th Cir. 2024) (finding no closed-ended continuity where "alleged

8    victims suffered a derivative injury stemming from . . . the only targeted victim of the

9    underlying transaction"); *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square*

10   *Assocs.*, 235 F.3d 629, 635 (D.C. Cir. 2001) (finding no RICO pattern because, "[t]o the extent

11   that [plaintiff's] partners were injured, they were injured indirectly, which does not make them

12   individual victims under RICO").

13          Courts consistently distinguish primary targets of alleged racketeering activity (i.e.,

14   actual victims who suffered resulting harm) from third parties (i.e., witnesses, bystanders, or

15   those who suffered indirect, derivative, or collateral injury), even if they participated in

16   transactions that were in some sense "part" of the scheme.  *Metaxas v. Lee*, 503 F. Supp. 3d

17   923, 943 (N.D. Cal. 2020) is instructive.  There, the court concluded that alleged misconduct

18   against regulatory agencies added to an amended complaint was "ancillary to what remains 'a

19   single scheme with a single victim.'"  *Id.* at 943. The court explained that "false reports to

20   regulators" were merely the "'inevitable consequence, or at most cover-up' of the [alleged]

21   scheme."  *Id.* at 943 (internal citation omitted).  The court also observed that if the defendants

22   actually were not liable to plaintiff—a real possibility given the "highly contingent nature" of

23   any wire fraud allegations—then the defendants "did not commit fraud in reporting those funds

24   as general assets in subsequent reports to the regulatory agencies."  *Id.* The court contrasted the

25   case with other "paradigmatic RICO cases involving . . . multiple victims."  *See id.* at *944

26   (citing *H.J. Inc.*, 492 U.S. at 249–50 (holding that several plaintiff-victims alleged a pattern

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 11

against defendants who paid and received multiple bribes over six years or more); *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529 (9th Cir. 1995) (ruling that pattern requirement was met where defendants demanded kickbacks from four victims and where "there [was] nothing to suggest that they would have ceased" because the scheme was "not connected to the consummation of any particular transaction")).

The Ninth Circuit similarly concluded certain third parties to a joint venture were ancillary to a claimed RICO scheme in *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc*., 833 F.2d 1360 (9th Cir. 1987). In *Medallion*, two television networks entered into a joint venture to acquire telecast rights to a professional boxing match. *Id*. at 1361. The networks were unable to sell the telecast rights to as many stations as anticipated, and both parties lost money. *Id*. The plaintiff alleged a scheme wherein the defendant misrepresented the number of licensing agreements it had obtained to induce it to enter the joint venture, amounting to wire fraud and racketeering. *Id*. at 1361-62. The plaintiff contended that the financier, the fight promoter, and individual television stations were also victims of defendant's racketeering, and also were defrauded by the defendant's false claims about the number of licensing agreements secured. *Id*. at 1364 n.3. But the court disagreed, explaining that the purported victims, even if touched by or involved in the scheme as third parties in some sense, ultimately received their end of the bargain (e.g., the television station received the telecast for the fight, and the fight promoter sold the telecast rights). *Id*. The same is true here: Western Alliance and any other lender received what they bargained for or otherwise suffered no harm attributable to the purported predicate acts.

Finally, in *Turner*, the court held that numerous entities were not victims of an alleged RICO scheme because they "suffered no legally cognizable injury." The defendants in that case previously had obtained a judgment against the plaintiff concerning various business interference torts; the plaintiff then alleged that the means defendants used to collect on the judgment violated RICO. *Turner*, 2002 WL 34420751, at *1. Plaintiffs alleged 94 instances of

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 12

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

fraud in the form of defendant's statements to insurance companies that any monies owed to plaintiff WPS should be turned over to defendants, when in fact there was no such legally binding requirement. *Id*. In ruling there was no pattern of racketeering, the court discussed how numerous alleged victims had not suffered a requisite injury under RICO. Even insurance companies that received allegedly fraudulent letters were not victims because there was "no evidence that they were defrauded of sums they did not owe or failed to receive the services for which they paid." *Id*. at *5. Also, the court that heard various unfounded collection proceedings was not a victim because "courts are frequently called upon to adjudicate actions that objectively lack merit." *Id*. at *6. In short, there was no plausible allegation that the scheme sought to defraud the insurance companies or the courts; only the plaintiff was the true target and victim of any such scheme. *See id.*; *see also Ganzi v. Washington-Baltimore Reg'l 2012 Coal.*, 98 F. Supp. 2d 54, 57 (D.D.C. 2000) ("reject[ing] such a broad interpretation of who may be considered a victim under RICO," as numerous alleged victims, even if theoretically affected by the scheme in a tangential way, were not targeted and did not suffer a cognizable injury). If the recipients of fraudulent letters and courts in Turner were not victims, then Western Alliance and any other lender clearly are not RICO victims here.

In short, AHP's effort to recharacterize defendants' routine business with its lenders as somehow nefarious is insufficient to plead around one of the fundamental flaws in its RICO theory: that only AHP could have been a victim of a closed-ended alleged scheme to supposedly "steal" the MLSA loans.

At best, the Complaint alleges that in furtherance of a scheme to "steal" the loans from and defraud AHP, some defendants allegedly misled Western Alliance or another lender regarding their ability to pledge the MLSA loans. That is very different than pleading a lender was the intended "victim" of a wrongful scheme or that they in fact suffered a RICO injury— which is what must be claimed regarding other alleged "victims" to adequately plead the "pattern" RICO element.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    The Complaint's failure to adequately allege a "pattern" requires dismissal of the RICO

2    Section 1962(a)-(c) claims.  Because the RICO conspiracy claims (Section 1962(d)) all hinge on

3    the underlying RICO claims, they also should be dismissed.  *See Religious Tech. Cir. v.*

4    *Wollersheim*, 917 F.2d 364, 367 n.8 (9th Cir. 1992) ("Because we find that RTC has failed to

5    allege the requisite substantive elements of RICO, the conspiracy cause of action cannot

6    stand.").

7    **C.    The Complaint Fails to Plausibly Allege Predicate Acts Constituting Racketeering
         Activity.**

8

9    "Racketeering activity," also referred to as "predicate acts," is by statute defined as

10   certain criminal acts under state and federal law.  *See* 18 U.S.C. § 1961(1).  The RICO claim

11   tries to invoke mail and wire fraud (18 U.S.C. §§ 1341 and 1343), insurance fraud (18 U.S.C. §

12   1033), bank fraud (18 U.S.C. § 1344), transportation of stolen money (18 U.S.C. § 2314) and

13   money laundering (18 U.S.C. § 1956).  Compl. ¶ 435.

14   The conduct AHP alleges that supposedly violated these statutes was "stealing" the

15   loans, "fraudulently" pledging the loans, the so-called "insurance scheme," and using the

16   proceeds of the "stolen" loans and the "insurance scheme."  Compl. ¶ 434(a)-(f).  But as shown,

17   the claim that any loans were "stolen" is not plausible due to the express terms of the MLSA in

18   which AHP sold and transferred its interest in them.  And the loans cannot plausibly have been

19   "fraudulently" pledged when (i) the MLSA did not impose any restriction on transferring or

20   pledging the loans, and (ii) the Complaint does not allege anyone represented the MLSA loans

21   would not be pledged.  And the so-called "insurance scheme" allegations fall far short of

22   plausibly establishing that there was no property and casualty coverage for the mortgaged

23   properties.

24   Like a "pattern," sufficiently pleading "predicate acts" is a basic requirement of

25   adequately stating a RICO claim.  The predicate acts pled in the Complaint fall by the wayside

26   when they are reviewed under the lens of plausibility that *Iqbal* and *Bell Atlantic* require.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 14

1

**D.    The RICO Claims Against Land Home Should Be Dismissed For the Additional**
**Reason That the Complaint Fails to Plead It Did Anything Other Than Service**
**MLSA Loans.**

2

3      The Complaint alleges that Land Home is servicing the MLSA loans.  Compl. ¶ 9.  The

4   First Amendment provided that Cymbidium could transfer servicing of the loans after July 1,

5   2023.[16]  Based on AHP's faulty claim that it, not Cymbidium, owns the loans, the Complaint

6   alleges that Land Home is wrongfully continuing to collect loan proceeds and disbursing them

7   to Magerick, Western Alliance, and others.  Compl. ¶ 9.  Regarding the RICO claims, the

8   Complaint alleges Land Home joined the enterprise by continuing to collect loan proceeds that

9   allegedly belonged to AHP, and by collecting and charging consumers for allegedly non-

10   existent insurance.  Compl. ¶ 444(a)-(c), 473.

11      To state a Section 1962(c) violation, the Complaint must plausibly allege Land Home

12   participated in the conduct of an enterprise through a pattern of racketeering activity.  *Sedimu v.*

13   *S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  To state a violation of Section 1962(b), it

14   must plausibly allege that Land Home gained control of the alleged RICO enterprise through

15   racketeering activity.  *De Los Angeles Gomez v. Bank of Am., N.A.*, 642 F. App'x 670, 675 (9th

16   Cir. 2016).  And for Section 1962(a), the Complaint must plausibly allege that Land Home

17   received money from a pattern of racketeering activity and invested those racketeering

18   proceeds.  *Id.*

19      Because the "predicate acts" that allegedly constitute the "racketeering activity" are

20   premised on fraudulent conduct, Rule 9(b)'s heightened pleading standard applies.  For the

21   RICO claims against Land Home, that means Rule 9(b) requires detail as to the time, place, and

22   manner of each act of fraud it supposedly engaged in.  *See Lancaster Cmty. Hosp. v. Antelope*

23   *Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).

24      The RICO claims against Land Home fall far short of this demanding standard.  As

25   already shown, the allegation regarding fraudulent billing for supposedly non-existent insurance

26

[16] Keller Decl. Ex. 2 (First Amendment) ¶ 7.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 15

is not plausible based on the facts alleged.  Beyond that, the only thing the Complaint alleges is that, after becoming aware of the dispute over ownership of the MLSA loans and entitlement to their proceeds, Land Home continued to do what it had been hired to do:  service the loans, paying expenses to maintain properties and turning loan proceeds over to its client or as directed by its client.

Once the implausible "non-existent" insurance claim is removed, the only thing the Complaint alleges Land Home did to supposedly join the alleged enterprise was to provide routine mortgage servicing to its customer.  A commercial party pursuing its regular, normal business activities is insufficient to establish RICO enterprise liability.  *See, e.g., Woodell v. Expedia Inc.*, No. C19-0051JLR, 2019 WL 3287896, at *7-8 (W.D. Wash. July 22, 2019) (collecting cases); *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011).

That Land Home continued to service the MLSA loans after it was made aware of this dispute changes nothing.  If a dispute exists over entitlement to loan proceeds, a mortgage servicer does not have to determine who is right and risk liability if it gets it wrong.  Just the opposite.  A mortgage servicer has a contractual and fiduciary duty to turn loan proceeds over to the party that hired it to service the loan.  If that is what a mortgage servicer does—and that is all the Complaint alleges Land Home did here—it is doing nothing more than continuing to provide normal and routine commercial services.  That is insufficient to be deemed to have joined a RICO enterprise, or to be directing an enterprise, nor is it receiving or investing money from a pattern of racketeering activity.  The Section 1962(a)-(c) RICO claims against Land Home are insufficient and should be dismissed.  And because the RICO conspiracy claims against Land Home hinge on the adequacy of the underlying RICO claims, they also should be dismissed.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

**E.    The Breach of Fiduciary Duty and Negligence Claims Against Land Home Should
Be Dismissed Because Land Home Did Not Owe AHP Any Duty.**

2

The Complaint does not allege that AHP hired Land Home to service the MLSA loans

3

for it.  Nor could it.  Land Home was hired by Oak Harbor to service the MLSA loans for

4

Magerick and others.  Because AHP did not hire Land Home to service the MLSA loans, Land

5

Home did not owe AHP either a fiduciary duty or a duty to exercise reasonable care.

6

Citing no factual basis whatsoever for the existence of such duties, the Complaint asserts

7

nothing more than the legal conclusion that, as a servicer of the loans, Land Home owed AHP a

8

fiduciary duty and a duty of reasonable care.  Compl. ¶¶ 414 and 426.  On that basis, AHP

9

asserts a breach of fiduciary duty claim (Count 2) and a negligence claim (Count 3) against

10

Land Home.

11

If AHP had hired Land Home to service the MLSA loans, Land Home would potentially

12

owe it a duty of care and certain fiduciary duties.  But AHP did not hire Land Home, and the

13

Complaint does not (and cannot) allege that it did.  Land Home was hired by others.  The fact

14

that AHP now asserts a highly disputed claim to entitlement to the loans does not create a

15

fiduciary duty or a duty of care on the part of a loan servicer hired by someone else.

16

Moreover, the allegation that a duty was owed is a conclusory allegation of law.

17

Conclusory allegations of law are insufficient to defeat a  Rule 12(b)(6) motion.  *Epstein*, 83

18

F.3d at 1150.  Whether a duty is owed is a legal issue under both California and Washington

19

law.  *See, e.g., Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 70

20

Cal. Rptr. 3d 199, 215 (2007) (whether fiduciary duty exists is a question of law—California);

21

*Lang v. Hougan*, 136 Wn. App. 708, 718, 150 P.3d 622 (2007) (same—Washington); *Nichols v.*

22

*Keller*, 15 Cal. App. 4th 1672, 1682, 19 Cal. Rptr. 2d 601 (1993) (existence of legal duty of care

23

in a given factual situation is a question of law to be determined by the courts alone—

24

California).  *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992) (same—

25

26

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 17

Washington).[17]  Land Home was not hired by AHP to service the MLSA loans, and because of that, Land Home did not owe AHP a fiduciary duty or a duty to exercise reasonable care.

**F.    The California Statutory "Theft" Count Fails to State a Claim.**

AHP's claim under California Penal Code Section 496(a) (Count 1) should be dismissed for two reasons.  First, that statute requires that property be stolen or obtained in some other manner constituting theft or extortion.  The MLSA renders any claim that the loans were "stolen" not plausible.  Second, as Western Alliance briefed in its pending motion to dismiss (Dkt. 74), California's presumption against extraterritorial application of its laws is not rebutted by any allegations in the Complaint of in-California wrongdoing.

The touchstone for Section 496(a) is knowingly buying or receiving or withholding "property that has been stolen or that has been obtained in any manner constituting theft or extortion."  Cal. Penal Code § 496(a).  In the MLSA, AHP contractually transferred to Cymbidium ownership of the loans, and it contractually relinquished any interest it had in them.  Indeed, AHP contractually represented and warranted in the MLSA that Cymbidium was purchasing the loans "free and clear" of <u>any</u> claims AHP had to them.[18]  Put simply, AHP contractually sold ownership of the loans.  It no longer owned something that could be "stolen."

What AHP had was a contractual right under the MLSA to receive back any remaining loans after Cymbidium had recovered the $19.75 million it paid AHP, plus certain fees and borrowing and other costs.  That AHP now claims Cymbidium received what it was owed—a very disputed contention being litigated in the case Cymbidium filed more than a year ago against AHP[19]—does not give AHP ownership of the remaining loans.  It gives AHP a (disputed) contractual right to seek to recover the loans or damages.  But having a contractual right is something very different than ownership.  For example, if the owner of a car enters into

---

[17] Washington and California case law is the same regarding this issue so which state's law would apply to the breach of fiduciary duty or the negligence claim against Land Home does not need to be decided at this juncture.

[18] Keller Decl. Ex. 1 (Mortgage Sale Agreement) at Section 8.01(vii).

[19] *Cymbidium v. AHP, et al.*, No. 2:24-cv-00025-KKE (W.D. Wash.).

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

a binding contract to sell the car to a buyer and then wrongfully refuses to deliver the car, the buyer does not "own" the car, and by refusing to deliver the car, the seller has not "stolen" the car. The buyer can enforce its contract and sue the seller for the car or damages. Stated another way, having a claimed contractual right to receive the remaining loans does not give AHP ownership of the loans. Because AHP does not own the loans, they (and their proceeds) cannot plausibly have been "stolen" from AHP. Cal. Penal Code § 496(a) does not apply.

Regarding the extraterritorial application issue, it was AHP's burden to plead, as to each defendant named in this count, that they knowingly received or withheld stolen property by conduct that occurred in California. The Complaint is devoid of any such allegations. The Complaint does not allege that any of the MLSA loans were California loans (they were not). And AHP's (mistaken) claim of ownership is based on the MLSA—which has a Washington choice of law provision not California law.[20] In addition, AHP is based in Illinois not California (Compl. ¶¶ 11-26), and the Complaint alleges that Mr. Weinstein is a resident of Washington (Compl. ¶ 46); that defendant Atlantica's principal place of business is in Seattle (Compl. ¶ 42); and that Magerick's principal place of business is in Seattle (Compl. ¶ 39).

In sum, the California Penal Code claim (Count 1) should be dismissed for two reasons. First, the Complaint does not plausibly allege the MLSA loans (or their proceeds) were "stolen" within the meaning of the statute. Second, sufficient facts are not pled to rebut the presumption against extraterritorial application.

**G.    The California Business and Professional Code § 17200 Claim Fails to State a Claim.**

Movants join in and incorporate by this reference the arguments made and authorities cited by Western Alliance for dismissal of the California Business and Professional Code §

---

[20] Keller Decl. Ex. 1 at § 14 ("The Agreement shall be construed in accordance with the laws of the State of Washington without regard to any conflicts of law provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of Washington, except to the extent preempted by Federal law.").

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 19

1    17200 claim (Count 15). Dkt. 74 at 20-21; Dkt. 90 at 10. AHP had the burden of pleading facts

2    sufficient to overcome the presumption against extraterritorial application of Section 17200, but

3    failed to do so.

4    **H.    The RESPA Counts Fail to State a Claim.**

5         Count sixteen claims violations by Land Home of the Real Estate Settlement Procedures

6    Act ("RESPA") 12 U.S.C. § 2607 and 24 C.F.R. § 3500.14. Count Seventeen alleges a RESPA

7    violation by defendant WWR Management, LLC ("WWR"). Count Sixteen alleges Land Home

8    received payment for unidentified mortgage services that either were not reasonably related to

9    the services provided or were for services it allegedly did not perform (Compl. ¶¶ 642-44). No

10   transactions and no specific charges are pled. Count Seventeen alleges WWR was providing

11   REO asset management sale services[21] to Oak Harbor and Magerick, and that it was paid $1,500

12   without performing the services for which it was compensated (Compl. ¶¶ 649-52). Again, no

13   transactions are identified. Nor are any actual facts pled—just that there were some unspecified

14   REO services for which there was a charge where services allegedly were not performed.

15        RESPA, and specifically 12 U.S.C. § 2607, is to protect consumers by prohibiting

16   kickbacks and the splitting of fees paid for settlement services. AHP is not a consumer. It

17   therefore lacks standing to assert any RESPA claims regarding the MLSA loans. *Freeman v.*

18   *Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012).

19        Equally important, these claims fail because RESPA does not regulate proceeds or

20   revenue from the sale and assignment of loans. What RESPA regulates is the market for real

21   estate settlement *services* (e.g., title searches, title insurance, services rendered by an attorney,

22   preparation of documents, property searches, rendering of credit reports and appraisals, etc.).

23   Relying on the clear language of § 2607(b), the Supreme Court held that this provision of

24   RESPA covers only a provider's splitting of a fee with one or more other persons. *See Quicken*

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [21] "REO" is an industry acronym for Real Estate Owned. It refers to when a lender has
     sufficient control over real estate collateral such that the lender owns the real estate.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 20

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

*Loans, Inc.*, 566 U.S. at 634.  The Complaint does not make this allegation, nor can it.  Rather, it loosely (and with no supporting facts) alleges that Land Home and WWR "engaged in the practice of receiving a payment that bears no reasonable relationship to the market value of the services provided…"  Compl. at ¶¶ 643 and 652.

In *Freeman v. Quicken Loans, Inc.*, the petitioners were three married couples who obtained mortgage loans from Quicken Loans, Inc.  They claimed the lender charged them fees for which no services were provided and that doing so violated RESPA.  Relying on the clear language of § 2607(b), the Supreme Court held that this provision of RESPA covers only a provider's splitting of a fee with others.  As explained by the Court:

> By providing that no person "shall give" or "shall accept" a "portion, split, or percentage" of a "charge" that has been "made or received," "other than for services actually performed," § 2607(b) clearly describes two distinct exchanges.  First, a "charge" is "made" to or "received" from a consumer by a settlement-service provider.  That provider then "give[s]," and another person "accept[s]," a "portion, split, or percentage" of the charge.  Congress's use of different sets of verbs, with distinct tenses, to distinguish between the consumer-provider transaction (the "charge" that is "made or received") and the fee-sharing transaction (the "portion, split, or percentage" that is "give[n]" or "accept[ed]") would be pointless if, as petitioners contend, the two transactions could be collapsed into one.

*Quicken Loans, Inc.*, 566 U.S. at 634 (citation omitted).

Accordingly, because the lender in *Quicken Loans* did not split its fee with anyone, there was no RESPA violation.  Here too, the Complaint does not allege that Land Home or WWR split fees they charged with anyone.

The Complaint's conclusory allegation that fees were charged where no services were performed does not save the RESPA claims.  Enough facts must be pled which, if true, make it plausible that RESPA liability exists.  Where, as here, no facts whatsoever are pled, and the allegation is nothing more than a bald conclusion of statutory liability, the claim is not facially plausible under the *Iqbal* pleading standard.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Because AHP is not a consumer, it lacks standing to bring any RESPA claims.  And even if it had standing, because the RESPA claims do not allege fee splitting, the RESPA claims fail as a matter of law.

## I.    The "Money Had and Received" Count Against WWR Fails to State a Claim.

It is unclear whether a claim for "money had and received" (Count 18) is being asserted against defendant WWR.  WWR is referenced in the subheading for Count 18.  Compl. at 124.  And WWR is referenced in ¶ 656 of the Complaint.  But WWR is not referenced in ¶ 659, which is where the defendants AHP contends owe money allegedly improperly received are listed.

If a claim for "money had and received" is being asserted against WWR in Count 18, it should be dismissed.  The few and only allegations concerning WWR are those in the RESPA claim (Count 17), i.e., the contention that WWR was paid $1,500 for REO property services but allegedly did not perform the services for which it was compensated.  Compl. ¶ 650.  As previously noted regarding the RESPA claim, not a single fact is pled to support that bald conclusory allegation.

Because no facts are pled, the "money had and received claim" against WWR fails to state a plausible claim under *Iqbal* and *Twombly*.  That claim and the RESPA claim (Count 17) are the only claims asserted against defendant WWR.  Because they both should be dismissed, WWR should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons:

- The RICO claims (Counts 4-9) fail to adequately allege either a "pattern" of racketeering activity or the requisite "predicate acts" and should be dismissed.

- The RICO claims against Land Home (Counts 4-9) should be dismissed for the additional reason that they allege nothing more than a loan servicer providing routine commercial services.

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 22

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

- The negligence (Count 3) and breach of fiduciary duty claims (Count 2) against Land Home should be dismissed because it did not owe AHP any duty.
- The California statutory "theft" claim (Count 1) should be dismissed because (i) AHP's claim that the MLSA loans were "stolen" is not plausible given the express terms of the MLSA transferring ownership of the loans, and (ii) the presumption against extraterritorial application has not been rebutted.
- The California Business and Professional Code § 17200 claim (Count 15) should be dismissed because the presumption against extraterritorial application has not been rebutted.
- The RESPA claims against Land Home (Count 16) and WWR (Count 17) should be dismissed because (i) AHP lacks standing, (ii) there is no allegation of unlawful "fee splitting," or (iii) no actual supporting facts are pled—there is nothing more than an unsupported, general conclusory allegation that fees were charged for services not performed.
- If a "money had and received" claim (Count 18) is being asserted, it should be dismissed because no facts making that claim plausible are pled.

DATED this 14th day of March, 2025.

BYRNES KELLER CROMWELL LLP

By /s/ Bradley S. Keller
   Bradley S. Keller, WSBA # 10665
By /s/ M. Victoria Molina
   M. Victoria Molina, WSBA #62109
   1000 Second Avenue, 38th Floor
   Seattle, Washington  98104
   Telephone: (206) 622-2000
   Facsimile:  (206) 622-2522
   Email:      bkeller@byrneskeller.com
               mvmolina@byrneskeller.com
   *Attorneys for Defendants Oak Harbor Capital;*

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 23

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

*Land Home Financial Services; Atlantica;*
*Magerick; William Weinstein; WWR*
*Management and Bradley Waite*

CERTIFICATION:  The above signature also certifies that this memorandum contains 7,841 words, in compliance with the Local Civil Rules.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 14th day of March, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel on record in the matter.

/s/ Bradley S. Keller
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
bkeller@byrneskeller.com

CERTAIN DEFENDANTS' MOTION TO DISMISS THE RICO
AND CERTAIN OTHER CLAIMS (NO. 2:25-cv-00007-KKE) - 25

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000